UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAGNA ELECTRONICS TECHNOLOGY INC.,

  Plaintiff,

v.

DYNACAST INC. and TEK-CAST INC.,

  Defendants.

Case No. 17-cv-11941
Honorable Laurie J. Michelson

**OPINION AND ORDER
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [15] AND
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [16]**

  For a time, Defendant Dynacast Inc. made automotive parts for Plaintiff Magna Electronics Technology, Inc. and Magna paid Dynacast for its work. But the arrangement broke down and the parties' dispute ended up in court. Before the litigation got going, counsel for Magna and Dynacast engaged in settlement negotiations. Magna has filed a motion for summary judgment, asserting that the parties did not merely negotiate a settlement but actually agreed to one. Dynacast has filed a motion for summary judgment, asserting just the opposite. For the reasons set forth below, the Court finds that the parties did not reach agreement on a walkaway.

**I.**

**A.**

  When both parties move for summary judgment there should be no material facts in dispute. That is the case here, as the lawyers' email communications set forth the material facts.

**1.**

For a time, Dynacast made covers and housings for car camera systems for Magna and Magna paid Dynacast for its work. But Magna became unsatisfied with the quality of the parts manufactured by Dynacast and, in September 2016, told Dynacast that it was going to transition to a new supplier. During the transition period, Dynacast would continue to make parts and Magna would continue to pay for them.

The transition did not go smoothly. In March 2017, Magna demanded that Dynacast return tooling that Magna owned. (R. 1, PageID.29.) But Dynacast refused to return to the tooling until Magna paid all that was owed for the parts it had supplied. (*Id.*) That prompted Magna to file this lawsuit. In particular, on April 7, 2017, Magna sued Dynacast in state court for breach of contract and conversion. (*See* R. 1, PageID.30–31.)

**2.**

Typically, once a plaintiff files suit, the relevant facts have already occurred; but just the opposite is true here.

On May 2, 2017, Magna (through counsel) and Dynacast (through counsel) reached an agreement regarding the tools in Dynacast's possession. Magna wrote, "Dynacast/Tek-Cast will send today all of Magna's tools for delivery to Magna. In exchange, upon delivery, Magna agrees to waive the conversion claims regarding the tools. All other claims between our clients, including breach of contract claims regarding the tools, are preserved." (R. 17, PageID.298.) Dynacast responded in part, "On the basis of this agreement, can I assume that you will withdraw the claim already filed in Michigan." (R. 17, PageID.297.) Magna's counsel replied in part, "We still have the contract element of the complaint, but let me talk with my client about withdrawing the complaint as a whole." (R. 17, PageID.297.)

A week later, May 9th, Magna's counsel emailed Dynacast's: "With regard to the remaining claims, between our clients, Magna has instructed me to either: (i) obtain a walk-away agreement on all claims between our clients by Friday or (ii) amend the complaint next week to add Magna's additional claims . . . associated with Dynacast's refusal to comply with its contractual obligations. I hope we can accomplish the former, but please let me know if you don't think that will be possible." (R. 17, PageID.297.)

Two days later, on May 11, Dynacast's counsel responded: "Dynacast's position is that [it] did not refuse to comply with [its] contractual obligations. . . . [Dynacast's] accounts receivable that remain outstanding were part of the negotiated solution between the parties to try to resolve the challenges and assist with a transition to a new supplier. Under these circumstances, it is difficult for Dynacast to simply forgive the agreed payment amounts." (R. 17, PageID.296.) The email continued, "In order to get this matter resolved, however, Dynacast is willing to accept a final payment of $300,000 in full settlement of the accounts receivable and all other claims." (R. 17, PageID.296.)

Magna was not willing to pay Dynacast $300,000. The next day, Magna's counsel emailed Dynacast's: "[Magna] ha[s] instructed me to proceed with amending the pending litigation to add the additional claims against Dynacast." (R. 17, PageID.295.)

This gave Dynacast's counsel pause. In particular, he wrote to Magna's counsel: "Before doing that, let me see if my client wants to go that direction or still pursue a complete walk away." (R. 17, PageID.295.)

Three days later, on May 15, 2017, Dynacast's counsel emailed the following to Magna's: "After further discussions with my client, they are willing to pursue a complete walkaway. If that

is still acceptable, please let me know and I will await a draft of a release agreement per your offer." (R. 17, PageID.295.)

That same day, Magna's counsel responded: "That is acceptable. Thanks." (R. 17, PageID.295.)

The draft release was never finalized. About a week after Magna's "[t]hat is acceptable" email, Dynacast's counsel emailed Magna's: "Are you preparing a settlement agreement and release agreement?" (R. 16, PageID.214.) To this, Magna's counsel responded: "I think I misread your prior email to suggest that you were putting it together. I've been travelling for depositions, but I can put something together quickly." (R. 16, PageID.214.) On June 2, 2017, Magna's counsel sent the draft: "My apologies for the delay, but please find the draft Settlement Agreement. Please let me know if you have any comments/edits and I can then arrange for execution." (R. 17, PageID.294.)

Three days later, on June 5, Dynacast indicated that it did not want to settle the case. Specifically, Dynacast's counsel emailed Magna's counsel the following: "In further review of its records, Dynacast discovered that the amount of the account receivable due from Magna was significantly higher than originally thought. Apparently, there were separate internal accounts for each shipping address. Because of this, Dynacast does not want to settle the claims and would like to pursue collection. That being the case, I suspect that Magna will want to pursue its claims as well. Please let me know if you have any other thoughts before we let the litigation proceed." (R. 17, PageID.294.) Magna's counsel was "disappointed to hear that, as our clients had an agreement." (*Id.*)

The next day, counsel for Magna and Dynacast continued to discuss the status of the settlement. Magna's counsel wrote to Dynacast's: "Following up on this issue further, our clients

had an agreement on the mutual walkaway with regard to the claims we were discussing. To the extent that your client no longer wishes to proceed on that basis, please let me know by Friday, and we will amend our claims (including adding a claim for breach of the settlement) and I'll send you the amended complaint next week. We will then proceed . . . in Oakland County Circuit Court." (R. 17, PageID.293.) Magna's counsel added, "If your client was not informed that they would be expected to comply with the agreement that you conveyed to me (remember, I was about to amend our complaint when you told me to stop and then confirmed that your client wanted the walkaway deal, which my client then accepted), that is a serious problem." (R. 17, PageID.293.)

Two days later, on June 8, Dynacast's counsel responded: "I had authority to convey the settlement offer that was conveyed. As I indicated, it was the new awareness of a change in facts that prompted Dynacast to want to proceed with collection. Indeed, the draft settlement agreement you sent 'expressly excludes, any Liabilities, . . . , unknown or not existing as at the Effective Date.'" (R. 17, PageID.293.)

**B.**

On June 15, 2017, Magna filed an amended complaint in the state court. In addition to a claim that Dynacast breached the parties' manufacturing agreement (by, among other things, supplying unsatisfactory parts), Magna sought a declaration that the parties had agreed to settle their dispute and claimed that Dynacast had breached that settlement agreement. (R. 1, PageID.18–19.)

Dynacast removed the case from state court to this one, and the parties have since filed cross motions for summary judgment on Magna's two settlement counts. Magna says the parties undoubtedly agreed to settle (R. 15); Dynacast says they undoubtedly did not (R. 16).

5

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

### A.

Magna and Dynacast have extensively briefed this question: Did they agree to a settlement? But they have not extensively briefed this question: Who decides if they agreed to a settlement? Yet this latter question could very well be dispositive when, as here, what was said and done is not disputed and the question of assent is a close call. In that scenario, if the ultimate question of mutual assent is one of fact for the jury, the close call precludes summary judgment. But if the ultimate question of mutual assent is one of law for the Court, the Court must answer the assent-no-assent question, close call or not.

Unfortunately, Michigan law does not provide a clear answer to the who-decides question. *Compare Kloian v. Domino's Pizza L.L.C.*, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006), *with Tecorp Entm't Ltd. v. Heartbreakers, Inc.*, No. 209861, 2001 WL 740007, at *2 (Mich. Ct. App. Feb. 9, 2001).

Fortunately, the Court does not need a clear answer. Even if the question of mutual assent is generally a question of fact for a jury (which, for several reasons, this Court tends to think is the better view, *see Martin v. De Young*, 205 N.W. 142, 144 (Mich. 1925); Mich. Civ. JI 142.10, 142.13), the Court must still make the call in this case. That is because neither side has made a demand for a jury. So whether now at summary judgment or later at a bench trial, it is this Court's

task to say whether Magna and Dynacast reached an agreement. And, as evidenced by their cross motions for summary judgment, both parties prefer this decision be made now rather than later.

**B.**

So was there "a meeting of the minds on all essential terms of a contract[?]" *Burkhardt v. Bailey*, 680 N.W.2d 453, 463 (Mich. Ct. App. 2004).

Magna's primary theory of mutual assent is based on its May 9, 2017 email and Dynacast's May 15, 2017 email. In the May 9 email, Magna's counsel told Dynacast's that he had been instructed to "obtain a walk-away agreement on all claims between our clients by Friday" or amend Magna's complaint to add clams. (R. 17, PageID.297.) Magna's counsel "hope[d]" the parties could "accomplish the former" option and asked Dynacast's counsel to "let [him] know." According to Magna, this was an offer for a contract. And says, Magna, Dynacast accepted this offer via its May 15 email: "After further discussions with [Dynacast], they are willing to pursue a complete walkaway." (R. 17, PageID.295.) Thus, says Magna, there was offer and acceptance of a contract.

The Court disagrees. As an initial matter, Magna's counsel stated that he had been instructed to obtain a walkaway "by Friday," May 12. So, arguably, any offer had expired by the time of Magna's May 15 email. *See* Restatement (Second) of Contracts § 41 (1981).

But even assuming otherwise (and further assuming that Magna's May 9 email was an offer) that offer ended on May 11. That day, Dynacast responded to Magna's May 9 email by stating it was "difficult for [Dynacast] to simply forgive the agreed payment amounts" and "to get this matter resolved . . . Dynacast is willing to accept a final payment of $300,000 in full settlement of the accounts receivable and all other claims." (R. 17, PageID.296.) For good measure,

7

Dynacast's counsel added, "Please share this with your client and let me know if we can get this wrapped up." (*Id.*) Thus, Dynacast's May 11 email was a counteroffer.

And counteroffers are generally rejections. *See Harper Bldg. Co. v. Kaplan*, 52 N.W.2d 536, 538 (Mich. 1952) ("Any material departure from the terms of an offer invalidates the offer as made, and results in a counter proposition, which, unless accepted, cannot be enforced."); 1 Williston on Contracts § 5:3 (4th ed.) (explaining that counteroffers are typically treated as rejections because the suggestion of different terms implies that the offered terms are not agreeable). And here, there is nothing equivocal about Dynacast's counteroffer that would render the general rule inapplicable. *Cf.* Restatement (Second) of Contracts § 38 (1981) ("[I]f the offeree states that he rejects the offer for the present but will reconsider it at a future time . . . there is no rejection.").

Magna complicates this straightforward analysis by arguing that its May 9 offer was a "standing offer" that Dynacast could accept even after the May 11 counteroffer. (R. 17, PageID.262–265.) In support of this argument, Magna cites two statements by Dynacast. On May 12, Dynacast's counsel stated, "Before [amending your complaint], let me see if my client wants to go that direction or *still* pursue a complete walk away." (R. 17, PageID.295 (emphasis added).) And then in the May 15 email, Dynacast's counsel stated, "[Dynacast is] willing to pursue a complete walkaway. If that is *still* acceptable, please let me know and I will await a draft of a release agreement *per your offer*." (R. 17, PageID.295 (emphasis added).) In Magna's view, Dynacast's use of the word "still" indicates that even Dynacast thought its "$300,000 counteroffer had not terminated Magna's standing offer" for a walkaway agreement. (*See* R. 17, PageID.265.)

The Court is unpersuaded by Magna's standing-offer argument. As stated, Dynacast unequivocally made a counteroffer, thus putting an end to Magna's May 9 offer (still assuming

that the May 9 email was an offer). *See* 1 Williston on Contracts § 5:3 (4th ed.) ("When an offer has been rejected, it ceases to exist, and a subsequent attempted acceptance is inoperative[.]"). Things might have been different had Magna indicated in its May 9 email that its offer of a walkaway agreement would "subsist regardless of [a] rejection." *See* 1 Williston on Contracts § 5:3 (4th ed.). But it did not do that. And things might have been different if after Dynacast's counteroffer, Magna had indicated that it was still open to a walkaway agreement. *See id.* But Magna did not do that either. To the contrary, after the $300,000 counteroffer, Magna's counsel told Dynacast's counsel that he had been "instructed . . . to proceed with amending the pending litigation to add the additional claims against Dynacast." (R. 17, PageID.295.) Thus, while Dynacast's use of the word "still" indicates that a walkaway remained a possibility, the use of that word does not alter the legal significance of a counteroffer. Nor does it reflect that Dynacast—let alone a reasonable company in Dynacast's position—thought Magna's May 9 offer remained available for acceptance.

In short, the Court finds that Magna's May 9 email and Dynacast's May 15 email did not constitute offer and acceptance forming a contract.

Magna presents an alternative argument. (*See* R. 17, PageID.266.) It says that Dynacast's May 15 email—"After further discussions with my client, they are willing to pursue a complete walkaway. If that is still acceptable, please let me know and I will await a draft of a release agreement per your offer."—was an offer. (*Id.*) And says Magna, it accepted that offer when it replied, "That is acceptable." (*Id.*)

While this alternate contract-formation theory has appeal, the Court believes the better view is that Dynacast did not make an offer to walk away. The May 15 email simply uses too much precatory language. Dynacast's counsel said Dynacast was "willing to *pursue* a complete

9

walkway"—not that Dynacast was "willing to completely walkway" or that Dynacast was "agreeable to a complete walkway." *See Kamalnath v. Mercy Mem'l Hosp. Corp.*, 487 N.W.2d 499, 504 (Mich. Ct. App. 1992) ("[A] mere expression of intention does not make a binding contract[.]"). And Dynacast's counsel underscored his use of the word "pursue" but suggesting that he wanted to review the precise language of the parties' mutual release: "If that is still acceptable, please let me know and *I will await a draft of a release agreement* per your offer."

And, as it turns out, there was good reason for Dynacast to want to see the precise language it would be agreeing to. While Magna paints the parties' agreement as simple (each party would just drop all of its claims against the other), the agreement was not so simple. In particular, when Magna sent Dynacast the referenced draft agreement, it read, "[Magna], on the one hand, and Dynacast, on the other hand, . . . release and forever discharge the other . . . of and from all past or present claims . . . *known* as at the Effective Date ('Liabilities'), that arise from or relate to the Litigation or the Dispute; provided, however, that this release does not release or discharge either Party from . . . any Liabilities . . . *unknown* or not existing as at the Effective Date[.]" (R. 18, PageID.354 (emphases added and removed).) Yet Dynacast's counsel avers, under penalty of perjury, "Upon review of the draft settlement agreement, I noticed that it failed to provide a complete walkaway from all of [Magna's] claims as related to the transaction and occurrence, as discussed by [Magna's counsel] and me. Instead, the draft agreement released Dynacast solely from any claims known to [Magna] arising out of the transaction and occurrence." (R. 16, PageID.196; *see also* R. 14, PageID.343 ("[B]y the word 'complete' Dynacast meant a release of all known and unknown claims.").) So while "complete walkaway" seems self-explanatory, it turned out that the scope of the release (known and unknown claims versus just known) required

further negotiation. This is additional support for reading Dynacast's statement "I will await a draft of a release agreement" as merely an offer to negotiate the details of a walkway.

Ultimately it is Magna's burden to show that the parties formed a contract "and no presumption will be indulged in favor of the execution of a contract." *Kamalnath*, 487 N.W.2d at 504. Thus, while close, the Court does not believe that Dynacast's May 15 email would have justified a reasonable company in Magna's position in believing that its "assent to [the] bargain [wa]s invited *and [would] conclude it*." *Eerdmans v. Maki*, 573 N.W.2d 329, 332 (Mich. Ct. App. 1997) (emphasis added); *see also Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 598 (Mich. 1993) (providing that Michigan courts "focus[] on how a reasonable person in the position of the promisee would have interpreted the promisor's statements or conduct"). Instead, Magna should have known that Dynacast "d[id] not intend to conclude a bargain until [it] has made a further manifestation of assent," Restatement (Second) of Contracts § 26. Thus, Dynacast's May 15 email is not an offer that could lead to the formation of a contract.[1]

**IV.**

For the reasons given, the Court does not find that the parties reached an agreement to settle their claims. As such, Dynacast's motion for summary judgment (R. 16) is GRANTED and Magna's (R. 15) is DENIED.

Dated: July 17, 2018

s/Laurie J. Michelson
LAURIE J. MICHELSON
U.S. DISTRICT JUDGE

---

[1] It is also worth noting that even if Dynacast's May 15 email were an offer, it would not necessarily follow that the parties had a contract. Magna's counsel apparently thought a walkaway meant dropping only known claims while Dynacast's counsel apparently thought a walkway meant dropping known and unknown claims. *See* Restatement (Second) of Contracts § 20 ("There is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and neither party knows or has reason to know the meaning attached by the other[.]").

11

## CERTIFICATE OF SERVICE

       The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 17, 2018.

                                                  s/Keisha Jackson
                                                  Case Manager